T.C. Memo. 1996-148


UNITED STATES TAX COURT



ESTATE OF FREDERICK CARL GLOECKNER,
DECEASED, JOSEPH A. SIMONE, AND
DOUGLAS DILLON, CO-EXECUTORS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8747-94.                    Filed March 25, 1996.



     R determined a deficiency in Federal estate tax
liability.  R contends that decedent's executors
underreported the value of certain shares of stock in a
closely held corporation that D held on the date of his
death.  Those shares were subject to a restrictive
agreement that obligated decedent's executors to sell,
and the company to buy, a certain number of shares.  R
contends that the value of D's shares is $4,580,000.
The executors contend that the value of those shares is
$2,298,161.25, which is the amount received by the
estate pursuant to the restrictive agreement.

     1.  Held:  The price term in the restrictive
agreement does not control the value of the stock for
Federal estate tax purposes.

     2.  Held, further, the value of the stock for
Federal estate tax purposes is $4,000,000.

James E. Daniels and Steven D. Goldberg, for petitioner.

Drita Tonuzi and Cheryl A. McInroy, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  Respondent determined a deficiency in Federal estate tax liability of $2,951,937.  The sole issue remaining for decision is the value of certain shares of stock that Frederick Carl Gloeckner (decedent) owned on the date of his death.  All section references are to the Internal Revenue Code in effect at the time of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts filed by the parties and accompanying exhibits is incorporated herein by this reference.

Decedent

Decedent died testate on July 28, 1990.  The co-executors of decedent's estate (the estate) are Joseph A. Simone and Douglas Dillon (collectively, the executors).  Decedent was survived by a nephew, a niece, a grandnephew, and a grandniece (his kin).

Fred C. Gloeckner & Company

Fred C. Gloeckner & Co., Inc. (the company), is a New York corporation organized in 1934.  At least until the time of decedent's death, the principal place of business of the company

was in New York City.  At the time of decedent's death, he owned 14,265 shares of stock in the company:  4,230 shares of common stock, 3,375 shares of 4-percent preferred stock, and 6,660 shares of 6-percent preferred stock (sometimes, collectively, decedent's shares).

The company was in the business of selling horticultural products (such as plants, foliage, bulbs, seeds, and supplies) at wholesale.  The company did not sell cut flowers or other finished products at retail.

The 1960 Redemption Agreement

On December 19, 1960, the shareholders of the company were decedent, Gustav H. Poesch (Poesch), and Leonard J. Seiger (Seiger).  Each shareholder owned both common stock and 4-percent preferred stock.  On that date, those shareholders subscribed to an agreement restricting their rights to dispose of their shares of stock in the company (the 1960 redemption agreement).

The 1960 redemption agreement restricted the right of each subscriber to dispose of his shares during his lifetime.  The parties agreed that, if a shareholder decided to transfer any of his shares, the company had the option, for a period of 3 months, to purchase those shares that the shareholder wished to transfer. They also agreed that if a shareholder ceased to be connected with the company (for a reason other than death), the company had the option to purchase all of that shareholder's shares.  The option price for the preferred shares was the shares' par value

plus an amount equal to any accumulated but unpaid dividends. The option price for the common shares was $100 a share. The 1960 redemption agreement provided for yearly revaluations of the option price for common shares.

## Joseph A. Simone

Joseph A. Simone (Simone) went to work for the company in 1975. He had just graduated from college, and his first job with the company was that of office boy. Simone continued his education after starting work with the company, earning an MBA from Fordham University in 1979. Also by 1979, Simone was involved in every facet of the company's operations. Subsequently, he became an officer of the company. Simone was elected to the board of directors of the company in 1984 or 1985.

Simone and decedent developed a close personal relationship. Decedent loaned Simone money ($80,000 in 1981 and $95,000 in a later year). Decedent named Simone a beneficiary in wills executed by decedent between 1985 and 1987.

## The 1987 Redemption Agreements

In 1987, decedent entered into an agreement restricting his rights (and the rights of the executors of his estate) to dispose of his shares of stock in the company (the 1987 redemption agreement). At that time, the stock of the company was held by decedent, Poesch, and Simone as follows:[1]

---

[1] The company issued the 6-percent preferred shares sometime
(continued...)

## Common Stock

| Shareholder | Number of Shares | Percentage |
|---|---|---|
| Decedent | 4,230 | 84.6 |
| Poesch | 750 | 15.0 |
| Simone | 20 | 00.4 |

## Preferred Stock

| Shareholder | Number of Shares of 4% Preferred | Number of Shares of 6% preferred |
|---|---|---|
| Decedent | 3,375 | 6,660 |
| Poesch | 1,725 | 1,500 |
| F.C.G. Foundation | 2,250 | 315 |

Decedent strongly believed that the best interests of the company would not be served if it were owned and managed by outsiders, including his family members.  Decedent also believed that Simone was the best candidate to be the chief executive of the company.  Decedent's plan of corporate succession was to have Simone both own and manage the company.

At the time of the 1987 redemption agreement, the company's senior management consisted of decedent, Poesch, and Simone. Poesch refused to enter into a similar redemption agreement. Simone, however, did enter into a similar redemption agreement. At the time of the 1987 redemption agreement, decedent was

---

[1](...continued)
after the 1960 redemption agreement was signed.

86 years old, Poesch was 77 years old, and Simone was 34 years old.

Among other things, the 1987 redemption agreement provided that, upon decedent's death, the company would redeem from decedent's estate a sufficient number of decedent's shares to provide decedent's executors with the funds necessary to pay death taxes, funeral expenses, and administration expenses (the mandatory redemption). The company had the option to purchase additional shares (the optional redemption). The 1987 redemption agreement also gave the company a right of first refusal restricting decedent's right to transfer his shares during his life.

When executed, the 1987 redemption agreement did not contain any price terms. In order to establish those price terms, the parties agreed: (1) KPMG Benchmark (Benchmark) would appraise the value of the company's shares (the 1987 appraisal), and (2) that appraisal value would control the agreement's price terms. Decedent did not further negotiate the price terms in the 1987 redemption agreement.

The values in the 1987 appraisal were later entered onto the 1987 redemption agreement. Those values were as follows: Common shares, $440 a share; 4-percent preferred shares, $34.75 a share; 6-percent preferred shares, $48 a share.

The 1987 redemption agreement provided that, with respect to the mandatory redemption, the company was required to pay the

redemption price to the estate in a lump sum, either in cash or by certified check. With respect to the optional redemption and the right of first refusal, the company could either: (1) Pay the entire purchase price in cash or by certified check, or (2) pay the purchase price in equal, semi-annual payments over a period not to exceed 5 years.

The 1987 Will

In 1987, simultaneously with entering into the 1987 redemption agreement, decedent executed a new will (the 1987 will). Decedent wished his kin to receive the assets of his estate other than his shares in the company. He did not wish his kin to bear any portion of either the taxes on his estate or the expenses of administering the estate. He wished Simone to receive his common shares in the company. The provisions of the 1987 will are consistent with decedent's wishes. In particular, with respect to Simone, one provision of the 1987 will provides that decedent's shares of stock in the company that are not redeemed pursuant to the 1987 redemption agreement pass to Simone. By another provision of the 1987 will, decedent bequeaths $40,000 to Simone.

The 1987 Gift

Simultaneously with decedent's execution of the 1987 will, he gave Simone 20 shares of common stock in the company, which represented a .4-percent ownership interest in the company.

The 1988 Sale

On January 4, 1988, the company redeemed all of Poesch's common stock (the 1988 sale). The company redeemed Poesch's stock for $290 a share. That amount was to be paid in five equal annual installments, with interest of 2 percent. Poesch died prior to the trial of this case.

Redemption of Decedent's Stock

Decedent died on July 28, 1990. Under the 1987 redemption agreement, the company was obligated to purchase from decedent's estate sufficient shares to provide decedent's executors with the funds necessary to pay death taxes and certain other obligations. Decedent's assets, other than his shares in the company, had substantially appreciated in value. To provide decedent's executors with the funds necessary to pay death taxes and other expenses, the company was required to redeem all of decedent's shares. The company, however, was insufficiently liquid to pay for all of those shares in a lump sum. Therefore, on April 28, 1991, the company and the estate entered into an agreement amending the 1987 redemption agreement (the 1991 amendment). The 1991 amendment allows the company to make installment payments in redemption of decedent's shares.

The Sherman Appraisal

Respondent's expert, Henry Sherman (Sherman), determined that the aggregate value of decedent's shares in the company on January 28, 1991, was $4,580,000. Sherman determined that, on that date, the value of each share of common, 4-percent

preferred, and 6-percent preferred stock was $965, $40, and $54.55, respectively.

Because he could find no acceptable comparable companies, Sherman did not analyze the values of comparable companies in determining the value of decedent's shares. Sherman gave little or no weight to the 1988 sale. Also, respondent instructed Sherman not to consider the 1987 redemption agreement. Moreover, Sherman did not: (1) Make a site inspection of the company's premises, (2) interview the management of the company, (3) secure information about the company from potential outside sources such as suppliers, customers, competitors, or financial institutions, or (4) obtain information about the company's competitors. Finally, the only information that Sherman had on the industry in which the company did business consisted of retail sales data that was provided by a trade association.

The Company and the Horticultural Industry

The Company. In January 1991, the company was not operated in the most profitable manner: In order to maintain its sales levels, the company relied to a significant extent on many slow-paying customers. The company used antiquated methods for processing and tracking orders and accounts. Many of the company's operations were not computerized, and sales orders were recorded manually.

The company's administrative offices were understaffed and, because of the company's New York City location, it was difficult to recruit workers with a satisfactory knowledge of horticulture.

Trends In the Horticultural Industry. Retail sales of horticultural products increased approximately $500 million (2-3 percent) from 1989 to 1990. That rate constituted a decreased rate of growth from previous years. Some of the industry growth at the retail level came from sales of imported horticultural products. Because the company sold products only to wholesalers, it did not necessarily benefit from retail growth.

In addition to foreign competition, the company faced competition from mass merchandisers and discounters. The growing presence of those competitors at the retail level exerted downward pressure on wholesale prices, adversely affecting the company, which sold to wholesalers.

Finally, the company did not make arrangements to secure exclusive sources of supply for its specialized products, whereas the company's competitors had made such arrangements. Those arrangements enabled the company's competitors to command higher prices for their goods.

Estate Tax Return

The executors timely filed Form 706, United States Estate (and Generation Skipping Transfer) Tax Return. On that return the executors reported that the value of decedent's shares was

$2,298,161.25. That was the amount paid for the shares under the 1987 redemption agreement. The executors elected alternate valuation, as provided for in section 2032.

Value of Decedent's Shares

The value of decedent's shares on the alternate valuation date was $4,000,000.

OPINION

I. Introduction

A. Questions Presented

This case concerns the value for Federal estate tax purposes of certain shares of stock in Fred C. Gloeckner & Co. (the company) owned by decedent at the time of his death. The executors of decedent's estate valued those shares at $2,298,261.25 on the estate tax return they filed. In the statutory notice of deficiency, respondent determined that the value of the shares (decedent's shares) was $6,000,000. At trial, however, respondent conceded that the value of decedent's shares was, at most, $4,580,000.

B. Arguments of the Parties

The executors claim that the value of decedent's shares is the value stated in the estate tax return because that is the amount paid by the company pursuant to the 1987 redemption agreement. They argue that the 1987 redemption agreement established the fair market value of those shares because it was a binding agreement entered into for a valid business purpose.

See May v. McGowan, 194 F.2d 396 (2d Cir. 1952); Lomb v. Sugden, 82 F.2d 166 (2d Cir. 1936); Wilson v. Bowers, 57 F.2d 682 (2d Cir. 1932).

Respondent argues that the 1987 redemption agreement does not establish the fair market value of decedent's shares, and that the fair market value is the value determined by respondent's expert witness, Henry Sherman (Sherman). Respondent argues that the 1987 redemption agreement does not establish the fair market value of decedent's shares because: (1) The 1987 redemption agreement is not a binding contract under New York law, (2) section 2703 requires that we disregard the 1987 redemption agreement, and (3) the price established by the 1987 redemption agreement cannot be trusted because the agreement is simply a substitute for a testamentary device.

C. Approach of the Court

We disagree with respondent's arguments that the 1987 redemption agreement is not binding or that section 2703 requires that we disregard the agreement. We agree with respondent's argument, however, that the 1987 redemption agreement is a substitute for a testamentary disposition designed to pass decedent's shares for less than full and adequate consideration. We do not agree with respondent that the value of decedent's shares is the value determined by respondent's expert. We have found that the value of decedent's shares on the alternate valuation date was $4,000,000.

II. The 1987 Redemption Agreement Is a Valid Contract

    A. Introduction

    Respondent argues that the 1987 redemption agreement is invalid under New York law for any of the three following reasons: (1) It was not supported by consideration, (2) the price term was originally left blank, thus rendering the contract void for indefiniteness, or (3) as the controlling shareholder, decedent was free to ignore its terms. Respondent has not convinced us that any of those reasons has merit.

    B. Consideration

    Given the preexistence of the 1960 redemption agreement, respondent contends that decedent's promises contained in the 1987 redemption agreement do not constitute legal consideration. Decedent's promises under the 1987 redemption agreement, however, differ from decedent's promises under the 1960 redemption agreement. Among other things, the 1960 redemption agreement does not deal with the 6-percent preferred stock (which stock had not been issued in 1960), while the 1987 redemption agreement does. We do not think that a New York court would find the 1987 agreement void for want of consideration. Cf. Zervos v. S.S. Sam Houston, 427 F. Supp. 500, 505 (S.D.N.Y. 1976) (holding the contract at issue invalid for want of consideration because one of the parties to that contract was already bound, under a prior contract, to perform acts identical to the acts that it agreed to

perform under the contract at issue), affd. 636 F.2d 1203 (2d Cir. 1980).

C. Open Price Term

New York courts will enforce a contract where the parties leave the price term open, provided that: (1) The parties intended to enter into a contract, and (2) the price "can be determined objectively without the need for new expressions by the parties". Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 548 N.E.2d 203, 206 (N.Y. 1989). The 1987 redemption agreement was enforceable, because the price terms therein could be objectively determined by reference to the 1987 appraisal. See In re McManus, 440 N.Y.S.2d 954, 957-958 (App. Div. 1981) (holding that a contract that restricted the transfer of closely held corporate stock was valid notwithstanding the open price term, because the price could be computed in accordance with a formula contained in the agreement), affd. 432 N.E.2d 601 (N.Y. 1982).

D. Controlling Shareholder

Finally, respondent argues that decedent's "complete control over the affairs of the corporation made the agreement meaningless and nonbinding during his lifetime." Respondent, however, offers no support for that assertion. In the absence of evidence indicating that decedent, Simone, or the company, viewed the 1987 redemption agreement itself as something other than a valid and enforceable contract, we will not ignore the 1987

redemption agreement.  See In re Estate of Spaziani, 480 N.Y.S.2d 854, 856 (Sur. Ct. 1984) (New York courts will enforce restrictions on a shareholder's right to dispose of his stock). Respondent has proven no facts showing the invalidity of the 1987 redemption agreement.

E.  Conclusion

We find that the 1987 redemption agreement was a valid and enforceable contract under New York law.

III.  Section 2703 Is Inapplicable

With an exception not here relevant, section 2703 provides:

(a) General Rule--For purposes of this subtitle, the value of any property shall be determined without regard to--

(1) any option, agreement, or other right to acquire or use the property at a price less than the fair market value of the property (without regard to such option, agreement, or right), or

(2) any restriction on the right to sell or use such property.

Section 2703 applies to any right or restriction created or "substantially modified" after October 8, 1990.  Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11602(e)(1)(A)(ii), 104 Stat. 1388, 1388-500.

Because the executors elected alternate valuation, as provided for in section 2032, we assume that decedent's shares were valued for estate tax purposes as of January 28, 1991. Respondent argues that, in valuing decedent's shares, we should

disregard the 1987 redemption agreement because of the 1991 amendment.  The 1987 redemption agreement was entered into <u>before</u> the effective date of section 2703.  The 1991 amendment, however, was entered into on April 28, 1991, which, with regard to amendments, is <u>after</u> the effective date of section 2703. Nevertheless, April 28, 1991, also is a date <u>after</u> January 28, 1991 (the alternate valuation date).  As of that date (January 28, 1991) the 1987 redemption agreement was unamended. Section 2703 is inapplicable.

IV.  <u>1987 Redemption Agreement Not Controlling</u>

A.  <u>Background</u>

Section 2001(a) imposes a tax on "the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  Section 2031(a) states:  "The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated."  Section 2032 provides that the value of the gross estate may be determined as of a date that, generally, is 6 months after the decedent's death, if the executor so elects.

The standard for valuation is fair market value.  Section 20.2031-1(b), Estate Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to

buy or to sell and both having reasonable knowledge of relevant facts." Section 2031(b), in particular, addresses the valuation of stock not listed on an exchange.

Courts have long held that, with respect to stock in a closely held corporation, the price term in a restrictive buy-sell or redemption agreement (a restrictive agreement) can fix the value of the stock for Federal estate tax purposes. See May v. McGowan, 194 F.2d 396, 397 (2d Cir. 1952); Lomb v. Sugden, 82 F.2d 166, 167-168 (2d Cir. 1936); Wilson v. Bowers, 57 F.2d 682, 683-684 (2d Cir. 1932). Since the above three cases were decided, the courts have developed a set of requirements for determining whether the price set forth in a restrictive agreement controls for purposes of the Federal estate tax. Recently, we summarized those requirements in Estate of Lauder v. Commissioner, T.C. Memo. 1992-736:

> It is axiomatic that the offering price must be fixed and determinable under the agreement. In addition, the agreement must be binding on the parties both during life and after death. Finally, the restrictive agreement must have been entered into for a bona fide business reason and must not be a substitute for a testamentary disposition. * * * [Citations omitted.]

Section 20.2031-2(b), Estate Tax Regs., embodies the three elements of the Lauder analysis:

> Even if the decedent is not free to dispose of the underlying securities at other than the option or contract price, such price will be disregarded in determining the value of the securities unless it is determined under the circumstances of the particular case that the agreement represents a bona fide business arrangement and not a device to pass the decedent's

shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth.   * * *

In Estate of Lauder v. Commissioner, supra, we made clear that it is insufficient that an agreement serve a bona fide business purpose.  For the price set forth in the agreement to control, the agreement also must not constitute a testamentary device.  Id.

B.   Business Arrangement; Testamentary Device

We have no doubt that the 1987 redemption agreement served both business and testamentary purposes.  On brief, the executors concede the following:  "Decedent had dual motives for the 1987 Redemption Agreement:  a succession plan for the Company and an estate tax plan to transfer the bulk of his assets to * * * [his kin], free and clear of federal and state estate taxes and administration expenses."  Moreover, the executors admit:  "Decedent's objective to perpetuate his company's existence may have, in theory, reduced the incentive to achieve the highest possible price for his heirs."  Nevertheless, the executors insist:  "there is no evidence in the record from which one could reasonably conclude as a factual matter that Decedent was willing to sacrifice a higher purchase price at the expense of * * * [his kin]."

We agree with that statement so far as it goes.  It must be remembered, however, that the kin would suffer only if the agreement price for the shares was inadequate to fund death taxes

and certain other expenses.  Except to the extent necessary to fund those liabilities, decedent's common shares had been bequeathed to Simone.  The relevant beneficiaries under the 1987 will are thus (1) decedent's kin and (2) Simone.  If we assume that decedent's testamentary intent was to maximize the benefit to both groups, so long as neither group benefited at the expense of the other, then it is consistent also to assume that decedent had no interest in the shares being valued for estate tax purposes at an amount greater than necessary to fund death taxes and certain other expenses.  Indeed, it is consistent to assume that decedent had an interest in <u>not</u> having the shares valued at an amount greater than necessary to satisfy those liabilities. That is because a greater value would <u>not</u> benefit the kin while, at the same time, the resulting increase in the estate tax would only further burden the company (which was required to redeem the shares in an amount sufficient to fund the death taxes and other expenses) and, by the same token, reduce the value of the bequest to Simone, who was 52 years younger than decedent.

Based on the foregoing analysis, we believe that the inference fairly may be drawn that decedent entered into the 1987 redemption agreement for, among other purposes, a testamentary purpose, viz, to reduce the tax on his estate.  We are not persuaded to the contrary by the fact that Simone entered into a similar agreement.  Simone received the shares subject to his agreement pursuant to decedent's overall plan, and Simone likely

took into account his own possible future benefit from ascribing to the shares a value that would be a low estate tax value in the decedent's estate.  In Estate of Lauder v. Commissioner, supra, to determine whether we should disregard the inference that the agreement there in question was designed to serve a testamentary purpose, we looked to whether the price to be paid for the decedent's stock under the agreement reflected adequate and full consideration in money or money's worth as of the date the agreement was executed.

The burden is on the executors to prove that the price to be paid for decedent's shares under the 1987 redemption agreement reflected adequate and full consideration in money or money's worth when the agreement was executed. Rule 142(a).  The executors have failed to carry that burden.  The price terms in the 1987 redemption agreement were determined pursuant to the 1987 appraisal.  The 1987 appraisal was the subject of a motion in limine by respondent to exclude that document from evidence because of the executors' failure to comply with Rule 143(f), which concerns itself with expert witness reports.  Respondent's motion was granted, and the 1987 appraisal was not received in evidence as an expert witness report.  Simone testified that, as of the time of decedent's death, and based in part of his review of the 1987 appraisal,  the value of the company was "in the range of $2 million".  Although we found Simone's testimony to be forthright, and it is generally accepted that an owner is

competent to testify as to the value of his property, e.g., <u>Juden v. Commissioner</u>, T.C. Memo. 1987-302, affd. 865 F.2d 960 (8th Cir. 1989); <u>Root v. Commissioner</u>, T.C. Memo. 1981-330; <u>O'Rourke v. Commissioner</u>, T.C. Memo. 1981-279, Simone did not convince us that the prices set in the 1987 redemption agreement reflected adequate and full consideration. The weight to be given to the testimony of an owner of property as to the value of the property depends upon the owner's knowledge, experience, method of valuation, and other relevant considerations. E.g., <u>Root v. Commissioner</u>, <u>supra</u>; <u>O'Rourke v. Commissioner</u>, <u>supra</u>. In 1987, Simone had less than a 1-percent ownership interest in the company, and that interest he obtained by gift. His testimony as to value was based, in part, on the 1987 appraisal, which is not in evidence as an expert witness report. Simone also stood to profit by a low estate tax valuation of the decedent's shares. We accord no weight to Simone's testimony as to what was adequate and full consideration in 1987.

On January 4, 1988, the company redeemed all of Poesch's common stock for $290 a share. That transaction occurred not long after decedent entered into the 1987 redemption agreement, and, for that reason, might be considered some evidence of whether the price to be paid for the decedent's stock under the 1987 redemption agreement reflected adequate and full consideration in money or money's worth as of the date of that agreement. See, e.g., <u>Estate of Andrews v. Commissioner</u>, 79 T.C.

938, 940 (1982) (for unlisted stocks, near contemporaneous sales, in the normal course of business, are the "best criteria of market value"). Poesch, however, owned only 15 percent of the common stock of the company. No doubt, therefore, he was forced to accept some discount. Estate of Jung v. Commissioner, 101 T.C. 412, 434 (1993) ("Cases involving the valuation of minority holdings in close corporations ordinarily consider a discount or discounts because the stock is a minority holding and is not publicly traded."). Poesch did not testify, since he died shortly after decedent. We cannot determine from the evidence in the record how much discount Poesch was forced to bear. In other words, we cannot work backwards from the $290 a share accepted by Poesch to an undiscounted value. We are unpersuaded that the undiscounted value of Poesch's shares was $440 (the amount determined for the common shares under the 1987 redemption agreement). Although we have considered Poesch's sale in determining the value of decedent's shares as of the alternate valuation date, see infra section V, we do not believe that that sale is persuasive evidence that the price to be paid for the decedent's stock under the 1987 redemption agreement reflected adequate and full consideration in money or money's worth when the agreement was executed. For the reasons stated, and considering the record as a whole, we find that the executors have failed to carry their burden of proving that the price to be paid for decedent's shares under the 1987 redemption agreement

reflected adequate and full consideration in money or money's worth as of the date of execution of the agreement.

V.  Fair Market Value of Decedent's Shares

Disregarding the 1987 redemption agreement, we must determine the fair market value of decedent's shares on the alternative valuation date.  We discount much of Simone's testimony for reasons similar to those previously stated. Respondent has conceded that the value of decedent's shares is no greater than $4,580,000.  We accept that concession and also find Sherman's opinion to be helpful in determining the fair market value of decedent's shares.

We do not, however, completely agree with Sherman because we find some weaknesses in his analysis of the value of decedent's shares.  First, Sherman did not make an on-site inspection of the company or interview the company's management.  Second, he could find no comparable companies on which to base his valuation. Third, we believe that Sherman did not adequately consider the effect of competition on the company's value.  The company sold in the wholesale market.  The company was in a poor competitive position vis-a-vis its domestic competitors, some of which were vertically integrated.  In addition, Sherman did not adequately analyze the impact of international competition on the company's value.  In analyzing the conditions in the horticultural industry, Sherman only analyzed retail sales figures.  Sherman, however, made no effort to determine the extent to which the growth in the horticultural industry's retail sales was

attributable to goods imported for retail sale. That issue is quite important to a proper determination of the company's value. A sharp increase in retail sales of imported goods could cause a sharp decrease in the company's value, because the company only sold products at the wholesale level.

Finally, Sherman did not take into consideration the 1988 sale by Poesch. The 1988 sale was at a discount, and we are unable to determine at how much of a discount. See section IV, supra. Nevertheless, we do not believe that the 1988 sale should have been disregarded by Sherman.

For the above reasons, and considering the record as a whole, we have found that the value of decedent's shares on the alternate valuation date was $4,000,000. We sustain respondent's determination of a deficiency to the extent consistent with our findings.

Decision will be entered under Rule 155.